| 74  313 |
| 103  97 |

### SANDS & MAXWELL LUMBER COMPANY v. WILLIAM CROSBY ET AL.

*Contract—Acceptance of offer—Specific performance.*

In this case the Court find that no valid contract was ever made between complainant and defendant Crosby for the purchase of the land in dispute, and that the bill for its specific performance was properly dismissed. The case involves questions of fact purely.

Appeal from Oceana. (Dickerman, J.) Argued February 15, 1889. Decided February 20, 1889.

Bill for specific performance of contract. Complainant appeals from decree dismissing bill. Affirmed. The facts are stated in the opinion.

*W. E. Ambler* (*L. N. Keating*, of counsel), for complainant.

*F. J. Russell* (*Montgomery & Bundy*, of counsel), for defendants.

CAMPBELL, J. Complainant filed a bill in the circuit court for Oceana county for the specific performance of

an alleged agreement whereby defendant Crosby was bound to convey 480 acres of land to complainant, but in violation of which he conveyed the lands to defendant Russell. The defendant Flood is charged as interested with Russell. The bill is rather vague in attempting to define in what precise manner the contract relations were made up; but inasmuch as no such contract could exist unless the entire terms of it were in writing, signed by Crosby or by some agent authorized by writing to sign for him, we shall look only to the proofs on the subject. All preliminary bargaining or communications were merged in an actual contract, if any existed, and its existence is the only thing which needs notice. The land was conveyed to Russell, and fully paid for. Unless some contract preceded this purchase, and should have prevented Crosby from conveying, the deed to Russell must stand. The court below dismissed the bill, and complainant appealed.

It appears from the testimony that Crosby, in the summer and early fall of 1887, had corresponded with one John R. Butler, of Hart, concerning the sale of this property, and a price had been named of $12 per acre, and various persons had talked with Butler about it. On September 28, Butler wrote that the dealing had failed, but that, if Crosby did not soon find a purchaser, he would try to do so. Crosby answered, in substance, that each of them would try and find a purchaser. No other letter was written by Butler till October 29, when Butler wrote asking for prices, and intimated that some persons were inquiring about it, and he could not answer. Meanwhile, on October 14, Russell wrote to Crosby for terms, and on the 15th Crosby told him he could have it for $5,000. In answer to a subsequent inquiry, Crosby wrote Russell, October 19, giving the descriptions of the various parcels of land, and saying he could probably make the

terms of payment satisfactory. He also suggested that his brother could help Russell examine the land. On the 22d, Russell wrote Crosby that he expected to close his term of court the next week, and would attend to the matter as soon as possible. At this time Butler seems to have had some talk with other parties; and about October 31, according to the testimony of Mr. Sands, and as shown by an exhibit, Butler wrote to Sands & Maxwell (who had been, and perhaps then were, individual partners) as follows:

"HART, MICH., Oct. 31, 1887.
"MESSRS. SANDS & MAXWELL,
"Pentwater, Mich.:
"Referring to yours of yesterday, Daniel Crosby's brother's name is Wm. Crosby, and his address is Harbor Springs, Mich. I anticipate the meaning of your letter, and I understand all about it, as I have been trying to make a sale for the heirs for some time. I think it will be for your benefit to see me before writing to Mr. C. If you will come up, I think I can make a trade with you. Let me hear from you before writing to Mr. C.
"Very truly yours,
"JOHN R. BUTLER."

Instead of going or writing to Mr. Butler, Sands & Maxwell sent this dispatch to Mr. Crosby:

'PENTWATER, M., Nov. 1, 1887.
"To WM. CROSBY,
"Harbor Springs, Mich.:
"Make us lowest price for six eighties of land, four days' refusal.      SANDS & MAXWELL."

To this Crosby answered by letter:

"SANDS & MAXWELL,
"Pentwater:
"Five thousand dollars ($5,000.00) is lowest cash price for six eighties in Elbridge, on sections 4, 9, and 10. Cannot give refusal, as I suppose other parties will look it this week. Have given no refusal.
"Very truly,      WM. CROSBY."

November 3, Sands & Maxwell telegraphed:

"We accept offer. Will pay two thousand cash; balance June 1. Send contract. Answer."

On the same day Crosby answered by letter, referring to the telegram, and saying:

"The proposition was for five thousand cash. If you will send five thousand dollars to bank at Petoskey, I will leave deeds conveying full title."

After stating the title, the letter proceeds:

"Do not see how I can take the time, or would meet you at Hart. If you decide to send the money, you had better examine records, and give bank instructions. Please answer at once, as I do not want to keep other parties waiting."

On this same day Crosby had written to Butler that there were three parties talking of buying,—Sands & Maxwell, F. J. Russell, and some Grand Rapids parties; that he had stated the price at $5,000, which he wanted net; that they would probably decide very soon, and he did not care who took it. On November 5, Butler telegraphed:

"Sands & Maxwell take the land at five thousand dollars. Send deeds to me, and I will collect."

On the same day Crosby had telegraphed to Sands & Maxwell:

"Do you want land as per my letter? Answer."

To this it was answered:

"Accept your proposition in letter Nov. 3. Send deeds to Butler, Hart.
                "SANDS & MAXWELL LUMBER Co."

This is the first appearance of complainant's name in the correspondence. On this same day Russell closed a bargain for the land, and paid for it in full, giving a small advance of $110. On Monday, November 7, com-

plainant, or Sands &.Maxwell, undertook to make a payment of $50 by way of earnest to Butler, who dated his receipt back to November 5. Being informed that they had not accepted Crosby's offer as made, and that he had therefore sold to Russell, they undertook to arrange with Butler what purported to be a payment of the balance, and demanded that deeds should be sent to him. Still later, they undertook to send the money to Petoskey.

We think the bill was rightly dismissed. Apart from some difficulties about descriptions and parties, it is evi. dent that complainant never accepted Crosby's offer, and never paid any money either at Petoskey or to Butler until the land had been sold. Crosby had expressly made his terms so that no rights were to be left executory. Until cash was actually paid, no rights were to be created. The case, in this respect, in no way differs from that of goods on which a price is set, which any one can close for, but which are not the property of any bidder or intended purchaser till the bargain is actually closed. Mr. Crosby, for reasons satisfactory to himself, chose to require the money to be paid down at Petoskey. From the record we could perhaps infer the reasons, but that is not important. Complainant could not, under the terms sent him, pay to Butler, or anywhere but at Petoskey. The money was not even paid or tendered to Butler until the sale had been completed to Russell. But Crosby had persistently declined making any contract arrangement, or anything which would not put the whole money in his own control, as a condition precedent to any sale. The case is not distinguishable in principle from *Whiteford v. Hitchcock, ante,* 208. There, as here, the purchaser avoided closing on the terms required, and we held that there was no bargain. We have no right to hold that sellers may not require their own conditions, and that buyers may substitute their own conditions

instead. We must assume that a seller means what he says, and has a right to impose his own terms. In the case before us, we do not think complainant has any equities over Russell, or that it has any reason to complain. But, in the absence of any binding contract, any outside considerations could not prevail to make one, if they existed, as we think they do not.

The decree must be affirmed, with costs.

The other Justices concurred.